Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employment relationship existed between plaintiff and defendant at all relevant times.
3. Defendant-employer is self-insured through the North Carolina Interlocal Risk Management Agency.
4. The date of the alleged injury by accident was 10 January 1996.
5. The average weekly wage for plaintiff at all relevant times was $407.60, yielding a compensation rate of $271.75.
6. The parties stipulated to the admission of the following documents:
 a) Employees medical records as submitted in a bound and indexed form, including supplemental medical records also submitted in a bound and indexed form obtained following the date of hearing.
 b) Transcript and tape of employees statement to Ms. Michelle Jones.
 c) Employees responses to employers First and Second Interrogatories.
d) Industrial Commission Forms 18, 19, 21 and 26.
 e) Supplemental affidavits as to attorneys fees to be filed by Defendants counsel.
7. Through 31 December 1998, defendant expended $988.08 as compensation for temporary total disability benefits, $16,740.30 for medical benefits, and $1,171.80 for vocational rehabilitation benefits and $5,431.85 for attorneys fees.
8. On 10 June 1999, defendants counsel submitted an affidavit stating that defendant had expended an additional $9,975.48 in attorneys fees through May 1999 and contemporaneously with the submission of a proposed Opinion and Award submitted an additional supplemental affidavit setting forth additional attorneys fees and expenses incurred by defendant of $3,380.64 since June 1999.
9. The issues to be determined are:
 a) Should the Forms 21 and 26 be set aside, and, if so, on what grounds?
 b) If the Forms 21 and 26 are set aside, what are the consequences in terms of repayment of benefits, assessment of legal fees and penalties?
 c) What amount, if any, of civil penalty should be assessed against the plaintiff?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 29 years old. He worked for the City of Kings Mountain for less than one year and was employed as a Crew Supervisor over grounds and maintenance. At the same time, plaintiff also worked for a professional softball team earning approximately $30,000.00 to $35,000.00 per year.
2. In his position with defendant-employer, plaintiff managed approximately six full-time city employees as well as six to eight inmates from the Dallas Correctional Center.
3. On 10 January 1996, the date of the alleged injury by accident, plaintiff and other city employees were salting roads following an ice storm.
4. On that date, plaintiff was descending stairs from defendants maintenance building when he slipped on ice, which had collected on the stairs. He landed on his right side, injuring his right shoulder.
5. Plaintiff reported his accident to Billy MacMurray, General Supervisor for defendant, a few minutes after he slipped on the icy stairs.
6. On 11 January 1996, plaintiff described the circumstances of his injury in a Form 19 he signed. According to that form, plaintiff was descending steps. When he reached the bottom of the steps, he started to turn and his foot slipped on ice, causing him to fall. He caught himself with his right arm, hurting his right shoulder. No witnesses were present at the time of plaintiffs fall.
7. On 11 January 1996, plaintiff presented to Kings Mountain Walk-in Clinic for treatment. The history given by plaintiff to the medical provider is consistent with his testimony at the hearing before the Deputy Commissioner regarding his fall on the ice and landing on his right upper extremity.
8. Plaintiff did not file a Form 18 and continued to work for defendant.
9. Although at the hearing before the Deputy Commissioner, plaintiff testified that he immediately sought medical attention following the alleged fall, he did not consult a doctor until the next day, 11 January 1996, when he presented to the Kings Mountain Walk-in Clinic and was seen by Dr. Adu. In addition to recounting the accident on the previous day, plaintiff also revealed that he had a past medical history of rotator cuff tendinitis in his right shoulder as a result of playing baseball.
10. Following treatment with Dr. Adu, plaintiff was seen by his personal physician, Dr. Mikell Jarratt of Gastonia Medical Specialty Clinic. Plaintiff first saw Dr. Jarratt on 25 January 1996. Dr. Jarratt referred him to Dr. Kingery of the Miller Orthopedic Clinic and Dr. Kingery ultimately referred plaintiff to Dr. Connor, who also works with Miller Orthopedic Clinic. Dr. Jarratt noted that plaintiff suffered from right shoulder pain.
11. Dr. David Kingery first examined plaintiff on 30 January 1996. The history given by plaintiff was consistent with his testimony regarding his fall on the ice and landing on his right upper extremity. Dr. Kingerys examination of plaintiff revealed asymmetry in the pectoralis major on the right with active contraction.
12. Dr. Kingery diagnosed plaintiff with a possible superior glenoid lesion (SLAP lesion) and suggested arthroscopic evaluation and corrective surgery if necessary. A SLAP lesion is a tearing of the labrum, which is a piece of tissue that surrounds or encircles the cuff of the shoulder. The tear is located on top of the shoulder where the biceps tendon hooks into it. According to both Dr. Kingery and Dr. Connor, SLAP lesions often have a strong correlation with rotator cuff injuries. Dr. Kingery released plaintiff to return to work full duty pending surgery. According to Dr. Kingery, plaintiff sustained a work-related injury.
13. On 13 March 1996, Dr. Kingery performed arthroscopic surgery, which ruled out the possibility of a SLAP lesion and instead revealed a partial tear of the rotator cuff. Dr. Kingery performed partial debridement of a rotator cuff tear and a subacromial decompression.
14. On 25 March 1996, after a follow-up visit, Dr. Kingery noted a normal post-operative examination and released plaintiff to return to light duty work with restrictions of no lifting or overhead work with the right arm.
15. On 3 April 1996 plaintiff returned to work at the same wage he earned at the time of his injury. Plaintiff later voluntarily left his job with defendant for a better-paying position.
16. On 28 May 1996, Dr. Kingery recommended that plaintiff undergo heavy physical therapy.
17. On 20 August 1996, plaintiff reported having increased shoulder pain. An MRI performed on 22 August 1996 revealed an active inflammation in the A/C joint, some attritional impingement change, and a mild degree of tendinitis within the bicipital tendon.
18. On 8 October 1996, Dr. Kingery gave plaintiff an injection to decrease tendinitis and associated pain.
19. On 10 December 1996, plaintiff reported to Dr. Kingery with continued complaints of A/C joint pain. Plaintiff was concerned about his ability to throw a softball because he was a semi-professional softball player. Dr. Kingery referred plaintiff to Dr. Patrick Conner with the Miller Orthopedic Group.
20. Dr. Connor first saw plaintiff on 31 December 1996, at which time plaintiff had no rotator cuff symptoms. Plaintiff did, however, complain that he was unable to throw a softball. Dr. Connor recommended physical therapy.
21. On 25 February 1997, plaintiff reported to Dr. Connor that his condition had improved and he had no problems with overhead throwing. Plaintiff was, however, still having some discomfort with his exercises in the A/C joint area.
22. On 15 April 1997, Dr. Connor found plaintiff at maximum medical improvement and assigned plaintiff a 10% permanent partial disability rating to his right upper extremity. The rating was assigned for the surgery and the anatomic changes that occurred from the surgery, both to plaintiffs rotator cuff and to the acrimon.
23. Plaintiff followed up with Dr. Connor on 25 February 1997, at which time he had no complaints or problems relating to overhead throwing.
24. Plaintiff returned to Dr. Connor on 15 April 1997. Plaintiff told Dr. Connor that while playing a professional softball game, he had to dive onto his shoulder, which he tolerated relatively well. Later in the same game, however, plaintiff again dove onto his shoulder with resulting excruciating pain that prevented him from continuing to play. After a long discussion with his coach and sponsor, plaintiff decided to give up playing professional softball.
25. Dr. Connor distinguished the new shoulder injury from the earlier alleged work injury and assessed a 10% permanent partial disability rating to the right upper extremity based on the prior surgery and plaintiffs complaints of inability to play softball.
26. Dr. Kingery later concurred with Dr. Connors assessment of a 10% permanent partial disability rating to the right upper extremity.
27. Defendant accepted plaintiffs claim after reviewing the Form 19 and the statement given by plaintiff.
28. On 21 May 1996, the Industrial Commission approved a Form 21 Agreement for Compensation for Disability pursuant to N.C. Gen. Stat. 97-82 for a right shoulder sprain and contusion, which occurred on 10 January 1996.
29. On 27 June 1997, the parties entered into a Form 26 Supplemental Agreement as to Payment of Compensation pursuant to N.C. Gen. Stat. 97-82 for the 10% permanent partial disability rating, which had been given by Dr. Connor. On 2 July 1997, plaintiff filed application to receive payment as a lump sum award. By a Form 31 submitted to the Industrial Commission, defendant agreed to pay the 10% permanent partial disability rating in a lump sum of $6,522.00.
30. Subsequent to defendants signing the Form 26 Agreement, claims adjuster Wendy Poole received a message from Mr. Bud Ray, an employee with defendant, that an article "On a Tear published in the Gastonia Gazette stated that plaintiff had injured his right shoulder playing softball in December 1995.
31. Ms. Poole immediately began to re-investigate the claim and conducted an unrecorded conversation with plaintiff. In that conversation plaintiff told Ms. Poole that he was walking beside Mr. Bill McMurray when he fell on the ice. In a recorded statement taken 9 September 1997 by Ms. Pooles supervisor, Ms. Michelle Jones, plaintiff again stated that Mr. McMurray was a witness to the accident.
32. Ms. Poole retained counsel to pursue investigation of the claim and possible rescission of the Form 21 and Form 26 Agreements due to misrepresentation and fraud by plaintiff and possible reimbursement of expenses. She also engaged the services of a private investigator.
33. On 8 October 1997, defendants counsel filed a Motion to Set Aside Approval of Form 21 Agreement and Withdraw Consent to Form 26 Agreement, citing misrepresentation and fraud by plaintiff. Defendants counsel also filed a Form 33 requesting that the matter be set for hearing.
34. The testimony of Garage Superintendent Randy Connor directly contradicted the testimony given by plaintiff, including whether plaintiff was backing a pay loader or back hoe into a parking spot in the upper lot near the time of the incident in the stairs. The Commission gives greater weight to plaintiffs testimony.
35. Mr. Connor also stated that plaintiff encouraged him to file a fraudulent workers compensation claim. Plaintiff denied this incident.
36. Mr. Ricky Putnam, an employee of defendants street department, also appeared as a witness at the hearing before the Deputy Commissioner. According to Mr. Putnam, one evening following the ice storm, he was standing by the time clock and overheard plaintiff talking to Mr. George Jacobs. Mr. Putnam alleges plaintiff told Mr. Jacobs that he had hurt his shoulder playing softball and that he was going to have surgery on his shoulder as a result of the softball injury.
37. Mr. George Jacobs, street department supervisor for defendant, shared an office with plaintiff and two other men. According to Mr. Jacobs, plaintiff told him on two separate occasions that plaintiff had sustained a rotator cuff injury playing softball. One such statement was made at the time clock following the ice storm. Plaintiff allegedly informed Mr. Jacobs that he had hurt his shoulder playing softball and that was why he had to have shoulder surgery.
38. Two other witnesses and Mr. Bill McMurray appeared as witnesses for defendant, pointing out discrepancies in plaintiffs statements.
39. Plaintiff insisted that he used a back hoe not a pay loader, and denied that he parked a pay loader or that he walked over to Mr. Connor following his fall to tell Mr. Connor that he had been injured. According to plaintiff, he was not hurt playing softball in December of 1995 as described in the newspaper article "On a Tear nor had he told anyone that he had been injured playing softball.
40. The Commission gives great weight to the testimony of both Dr. Kingery and Dr. Connor that plaintiffs shoulder injury and resulting disability are work-related.
41. The Deputy Commissioner who heard all the testimony found by the greater weight of evidence presented that plaintiffs testimony was credible. Although there is considerable contrary evidence in the record, the Full Commission declines to reverse the credibility determination made by the Deputy Commissioner.
42. Defendant failed to present sufficient evidence by which to prove by the greater weight that the Forms 21 and 26 should be set aside due to fraud or misrepresentation.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course and scope of his employment with defendant on 10 January 1996, when he fell on icy stairs and landed on his right upper extremity. N.C. Gen. Stat. 97-2(6).
2. Absent a showing of fraud, misrepresentation, mutual mistake, or undue influence, an agreement for compensation approved by the Commission cannot be set aside. N.C. Gen. Stat. 97-17. In this case, defendant failed to prove by the greater weight of the evidence any fraud or misrepresentation by plaintiff.
3. As a result of his compensable injury by accident on 10 January 1996, plaintiff is entitled to payment of the 10% permanent partial disability rating to his right arm given by Drs. Kingery and Connor. N.C. Gen. Stat. 97-31.
4. Plaintiff is entitled to have defendant provide all medical treatment arising from this compensable injury by accident to the extent that it tends to effect a cure, provide relief, or lessen his disability. N.C. Gen. Stat. 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff $6,522.00 in a lump sum for the 10% permanent partial disability rating to his right arm.
2. The Forms 21 and 26 filed in this case remain in full force and effect and are not set aside.
3. Defendant shall pay directly to plaintiffs attorney a reasonable attorneys fee of twenty-five percent of the compensation distributed to plaintiff in Paragraph 1 of this Award.
4. Defendant shall pay all medical expenses incurred by plaintiff as a result of the 10 January 1996 compensable injury by accident.
5. Defendant shall pay the costs.
This the ___ day of June, 2000.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/______________ RENE C. RIGGSBEE COMMISSIONER